UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TINA MARIE SMITH ex rel. M.M.S.,

                            Plaintiff,

                                                                                Case # 16-CV-362-FPG

v.

                                                                                  DECISION AND ORDER

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.
_____

## INTRODUCTION

Tina Marie Smith ("Plaintiff") brings this action on behalf of her minor daughter ("M.M.S.") pursuant to Title XVI of the Social Security Act ("the Act") seeking review of the final decision of the Acting Commissioner of Social Security ("the Commissioner") that denied her application for Supplemental Security Income ("SSI"). ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c).

Both parties have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure Rule 12(c). ECF Nos. 10, 11. For the reasons that follow, Plaintiff's motion is GRANTED and the Commissioner's motion is DENIED. The Commissioner's decision is REVERSED and this matter is REMANDED to the Commissioner solely for the calculation and payment of benefits.

## BACKGROUND

On December 10, 2012, Plaintiff applied for SSI with the Social Security Administration ("the SSA") on M.M.S.'s behalf. Tr. 137-42.[1] She alleged that M.M.S. had been disabled since August 9, 2006, due to sleep apnea, asthma, behavior and breathing problems, and hyperactivity.

---

[1] References to "Tr." are to the administrative record in this matter.

Tr. 155. On September 3, 2014, M.M.S. and Plaintiff testified at a hearing before Administrative Law Judge Bruce R. Mazzarella ("the ALJ"). Tr. 29-69. On December 16, 2014, the ALJ issued a decision finding that M.M.S. was not disabled within the meaning of the Act. Tr. 11-14. On March 9, 2016, the Appeals Council denied M.M.S.'s request for review. Tr. 1-6. This action seeks review of the Commissioner's final decision. ECF No. 1.

## LEGAL STANDARD

### I. District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotation marks omitted); *see also* 42 U.S.C. § 405(g). The Act holds that a decision by the Commissioner is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quotation marks omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quotation marks omitted); *see also Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990) (holding that review of the Secretary's decision is not *de novo* and that the Secretary's findings are conclusive if supported by substantial evidence).

### II. Child Disability Standard

An individual under 18 years old will be considered disabled if he or she has a medically determinable physical or mental impairment that results in marked and severe functional

limitations that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i).

The Commissioner must follow a three-step process to evaluate child disability claims. *See* 20 C.F.R. § 416.924. At step one, the ALJ determines whether the child is engaged in substantial gainful work activity. *See* 20 C.F.R. § 416.924(b). If so, the child is not disabled. If not, the ALJ proceeds to step two and determines whether the child has an impairment, or combination of impairments, that is "severe," meaning that it causes "more than minimal functional limitations." 20 C.F.R. § 416.924(c). If the child does not have a severe impairment or combination of impairments, he or she is "not disabled." If the child does, the ALJ continues to step three.

At step three, the ALJ examines whether the child's impairment meets, medically equals, or functionally equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). 20 C.F.R. § 416.924(d). To determine whether an impairment or combination of impairments functionally equals the Listings, the ALJ must assess the child's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. §§ 416.926a(b)(1)(i)-(vi). To "functionally equal the listings," the child's impairment(s) must cause "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a).

# DISCUSSION

## I. The ALJ's Decision

The ALJ's decision analyzed M.M.S.'s claim for benefits under the process described above. At step one, the ALJ found that M.M.S. had not engaged in substantial gainful activity since the application date. Tr. 14. At step two, the ALJ found that M.M.S. has the following severe impairments: sleep apnea, asthma, oppositional defiant disorder, and attention deficit hyperactivity disorder ("ADHD"). Tr. 14. At step three, the ALJ found that these impairments, alone or in combination, did not meet or medically equal an impairment in the Listings. *Id.*

As to the six domains of functioning, the ALJ found that M.M.S. had "marked limitation"[2] in Attending and Completing Tasks; "less than marked" limitation in Acquiring and Using Information, Interacting and Relating with Others, Moving About and Manipulating Objects, and Health and Physical Well-Being; and "no limitation" in Caring for Herself. Tr. 17-24. Thus, the ALJ found that M.M.S.'s impairments, alone or in combination, did not functionally equal an impairment in the Listings. Tr. 15. Accordingly, the ALJ found that M.M.S. was not disabled within the meaning of the Act. Tr. 24.

## II. Analysis

M.M.S. argues that the Commissioner's decision should be reversed because the ALJ erred when he found that she has a "less than marked" limitation in the Acquiring and Using Information domain. ECF No. 10-1, at 13-21. M.M.S. asserts that the evidence demonstrates that she has "marked" limitation in this domain and that the ALJ's conclusion to the contrary is due to legal errors and improperly weighing the evidence. *Id.* The Court agrees.

---

[2] The SSA will find that the claimant has a "marked" limitation in a domain when his or her impairment(s) "interferes seriously" with his or her "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).

The Acquiring and Using Information domain focuses on a child's ability to acquire or learn information and to use the information that he or she has learned. 20 C.F.R. § 416.926a(g). A school-age child like M.M.S. (*i.e.* a child between ages six and twelve) should be able to read, write, perform math calculations, and discuss history and science, and he or she should be able to demonstrate these skills in academic and daily living settings. *Id.* at § 416.926a(g)(2)(iv). Examples of limitations in this domain include a lack of understanding of words about space, size, or time; an inability to rhyme; difficulty recalling important things learned in school yesterday; difficulty solving mathematics questions or computing arithmetic answers; and speaking only in short, simple sentences and difficulty explaining oneself. *Id.* at § 416.926a(g)(3)(i)-(v).

### 1. Evidence Relevant to the Acquiring and Using Information Domain

In M.M.S.'s benefits application, Plaintiff reported that M.M.S.'s impairments limit her progress in understanding and using what she has learned. Tr. 147. Plaintiff indicated that M.M.S. does not know her age, birthday, or telephone number, does not ask what words mean, cannot define common words or read capital letters of the alphabet, and cannot understand jokes. *Id.* She indicated that M.M.S. could recite numbers to three and to ten, count three objects, and identify most colors and shapes. *Id.* Plaintiff also testified that M.M.S. "gets extra help" in reading and math, and that she has difficulty applying and explaining what she learned in school.[3] Tr. 50, 59.

Certified Pediatric Nurse Practitioner Christine Scime ("NP Scime") completed a medical statement wherein she checked a box opining that M.M.S. had only a "moderate" limitation in

---

[3] Although the ALJ's decision included boilerplate language indicating that he found "the statements concerning the intensity, persistence, and limiting effects of [M.M.S.'s] symptoms . . . not entirely credible," he does not engage in a credibility analysis or specifically discount any of Plaintiff's statements. Tr. 17.

5

the Acquiring and Using Information domain.[4] Tr. 455. NP Scime provided no explanation for this finding and her attached treatment notes do not illuminate her conclusion. Tr. 454-63.

M.M.S.'s special education teacher Kathleen Carpenter ("Ms. Carpenter") completed a "Teacher Questionnaire" wherein she rated and described M.M.S.'s limitations in each functional domain. Tr. 162-69. Ms. Carpenter indicated that M.M.S. had "serious problems":

- comprehending oral instructions;
- understanding school and content vocabulary;
- understanding and participating in class discussions;
- providing organized oral explanations and adequate descriptions;
- expressing new ideas in written form; and
- learning new material.

Tr. 163. Ms. Carpenter indicated that M.M.S. had "very serious problems":

- reading and comprehending written material;
- comprehending and doing math problems;
- recalling and applying previously learned material; and
- applying problem-solving skills in class discussions.

*Id.* Ms. Carpenter further explained her assessment by writing:

> [M.M.S.] is in the integrated co-teaching classroom. She [receives] instruction from the general education and special education teacher 5 days a week. She has trouble staying on task and focusing in large and small groups. She is at the intensive level (below grade level) in both reading and math. It is unknown at this time if this is due to her ability to stay on task or her high absenteeism.

*Id.*

M.M.S.'s Individualized Education Program ("IEP")[5] demonstrates that she required many accommodations and services in a self-contained classroom setting.[6] It notes, for example,

---

[4] The form directed NP Scime to check one box for each domain and provided the following options: "No Limitation," "Moderate Limitation," "Marked Limitation," and "Extreme Limitation." *See* Tr. 454-55.
[5] An IEP is a document created for every child who receives special education services. It details the child's learning needs, the services the school will provide, and how progress will be measured. *See* Kristin Stanberry, Understanding Individualized Education Programs, https://www.understood.org/en/school-learning/special-services/ieps/understanding-individualized-education-programs (last visited Aug. 7, 2017).

6

that she required testing accommodations such as taking exams in a separate room with minimal extraneous noises and visual distractions, revised test directions, additional examples, and extended time. Tr. 222. The IEP also indicates that M.M.S. "is easily distracted and needs adult prompting to remain focused on academic tasks" and that her "attentional difficulties and impulsivity impact her ability to access the general education curriculum." Tr. 219; *see also* Tr. 265. From 2013 to 2014, M.M.S. required additional integrated co-teaching services. Her English/language arts services increased from 60 minutes to 115 minutes daily, her math services increased from 60 minutes to 90 minutes daily, and her science services increased from 30 minutes to 90 minutes daily. Tr. 203, 221.

M.M.S.'s IEP also notes that she had the following scores on the Wechsler Preschool and Primary Scale of Intelligence ("WPPSI-III")[7] test: Full Scale – 81, Performance – 82, and Verbal – 83. Tr. 217. These scores demonstrate that her cognitive ability is in the "low average" range. Tr. 242. Her scores on the Woodcock-Johnson III Achievement Tests[8] were: Academic Knowledge Cluster – 92, Applied Problems – 97, and Letter-Word Identification – 91. Tr. 217. These scores demonstrate that her academic achievement is in the "average" range. Tr. 245.

M.M.S.'s IEP also indicates that she scored at the "strategic level" for reading and math. Tr. 218. The IEP notes that M.M.S. "is just beginning to feel confident enough to write 3-4

---

[6] This is important because ALJs must consider the "effects of structured or supportive settings" on a child's ability to function normally. 20 C.F.R. § 416.924a(b)(5); *see also Archer ex rel. J.J.P. v. Astrue*, 910 F. Supp. 2d 411, 426-27 (N.D.N.Y. 2012).

[7] Psychologists use the WPPSI-III to assess young children. Tr. 242. It measures Full Scale IQ, Verbal IQ, Performance IQ, and Processing Speed and has an optional General Language Composite. *See* School Psychology Services, Wechsler Preschool and Primary Scale of Intelligence (WPPSI-III), http://www.school-psychology.com.au/blog/wechsler-preschool-and-primary-scale-of-intelligence-wppsi-iii/ (Mar. 30, 2009) (last visited Aug. 3, 2017). A standard score from 80 to 120 is considered within a broad range from low to high average. Tr. 242.

[8] The Woodcock-Johnson III Achievement Tests measure intellectual abilities and academic achievement. These tests can determine an individual's cognitive strengths and weaknesses and identify certain factors related to future development. *See* Woodcock Johnson III – Tests of Cognitive Skills, http://cps.nova.edu/~cpphelp/WJIII-ACH.html (last visited Aug. 3, 2017). A standard score of 90 to 110 is considered the "average" range, a score of 80 to 89 is the "low average" range, a score of 70 to 79 is the "low" range, and scores below 69 are in the "significantly delayed" range. Tr. 245.

sentences independently during writer's workshop. She is able to develop a topic in her head and transfer it onto paper, using strategies to write words she is unsure of how to spell." *Id.* It also explains that M.M.S. "appears to have average cognitive skills but is highly distracted and impulsive which impacts her functioning in the classroom" and that she "needs support to develop attending and academic skills." *Id.*

### 2. The ALJ's Findings in the Acquiring and Using Information Domain

The ALJ concluded that M.M.S. had a "less than marked" limitation in the Acquiring and Using Information domain based on: (1) her "average range" WPPSI-III scores, her Woodcock-Johnson III scores, and her achieving "strategic level" in both reading and mathematics; (2) the IEP's indication that her "cognitive skills appear to be average"; and (3) NP Scime's opinion that she had only a "moderate" limitation in this domain. Tr. 18 (citing Tr. 217-18, 455).

The Court finds that the ALJ's conclusion in this domain, which was limited to a single paragraph, is not supported by substantial evidence and that he improperly weighed the evidence of record. First, the ALJ's recitation of M.M.S.'s WPPSI-III and Woodcock-Johnson test scores without explaining what the scores meant is insufficient and does nothing to illuminate his finding in this domain. *See Keene ex rel J.T. v. Astrue*, 901 F. Supp. 2d 339, 349 (N.D.N.Y. 2012) (holding that the ALJ's finding that the plaintiff had a "less than marked" limitation in the Acquiring and Using Information domain was flawed in part because he pointed to the plaintiff's test scores "without explaining what the scores meant"). Moreover, the document that contains M.M.S.'s WPPSI-III and Woodcock-Johnson test scores does not explain how to interpret these scores or provide any insight as to how M.M.S. performed.[9] Tr. 217. Similarly, it is not clear

---

[9] A different portion of M.M.S.'s IEP interprets the WPPSI-III and Woodcock-Johnson test scores, but the ALJ does not cite these records anywhere in his decision. Even so, it is not clear that scoring in the "low average" range on the WPPSI-III and in the "average" range on the Woodcock-Johnson test supports the ALJ's conclusion that M.M.S. had a "less than marked" limitation in the Acquiring and Using Information Domain. Tr. 242, 245.

8

that scoring at the "strategic level" in reading and mathematics supports the ALJ's conclusion that M.M.S. has a "less than marked" limitation in the Acquiring and Using Information domain.

Furthermore, it is not apparent if the ALJ considered whether M.M.S.'s performance on these tests was due to her special education accommodations. Although the ALJ "need not make explicit reference to the effects of a structured or supportive setting," the SSA's regulations require the ALJ to consider the "effects of structured or supportive settings" on a child's ability to function normally. 20 C.F.R. § 416.924a(b)(5); *see also Archer*, 910 F. Supp. 2d at 426. This is because a structured or supportive setting may minimize the claimant's signs and symptoms of impairment and improve his or her functioning while he or she is in that setting, but the claimant's signs, symptoms, and functional limitations may worsen outside of that setting. 20 C.F.R. § 416.924a(b)(5)(iv)(C).

Second, the ALJ's citation to the IEP note that M.M.S. "appears to have average cognitive skills" without further context is misleading. Tr. 18 (citing Tr. 218). The IEP goes on to explain that M.M.S. is "highly distracted and impulsive which impacts her functioning in the classroom." *Id.* The note further indicates that she has difficulty attending to tasks and focusing independently or in group settings, that she frequently distracts her classmates, and that she "needs support to develop attending and academic skills." *Id.* ALJs may not "cherry pick" evidence, which means that they may not "credit[] evidence that supports administrative findings while ignoring conflicting evidence from the same source." *Younes v. Colvin*, No. 1:14-CV-170 DNH/ESH, 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015) (citations omitted). "'Cherry picking' can indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." *Id.* (citing *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010)). Although the ALJ only highlighted M.M.S.'s "average cognitive skills," the IEP

9

demonstrates that she struggled academically and therefore does not support the ALJ's conclusion that she has a "less than marked" limitation in the Acquiring and Using Information domain.

Finally, NP Scime's opinion that M.M.S. had only a "moderate" limitation in the Acquiring and Using Information does not provide substantial evidence for the ALJ's finding in this domain. Tr. 18 (citing Tr. 455). NP Scime merely checked a box indicating a "moderate" limitation in this domain without any explanation, and her treatment notes do not illuminate this conclusion. Tr. 454-63. Courts have noted that standardized forms are "only marginally useful for purposes of creating a meaningful and reviewable factual record." *Halloran v. Barnhart*, 362 F.3d 28, 31 n.2 (2d Cir. 2004). As will be discussed in more detail below, the Court is troubled that the ALJ relied on NP Scime's uninformative assessment and rejected Ms. Carpenter's very thorough report. Interestingly, although the ALJ relied on NP Scime's findings in the Acquiring and Using Information domain, he rejected her opinion that M.M.S. had a "moderate to marked" limitation in the Caring for Self domain and a "marked" limitation in the Interacting and Relating with Others domain in part because the ALJ found those opinions inconsistent with Ms. Carpenter's assessment in those domains. Tr. 18 (citing Tr. 162-69, 455).

Accordingly, for all the reasons stated, the Court finds that the ALJ erred when he weighed the evidence of record and that his conclusion in the Acquiring and Using Information domain is not supported by substantial evidence.

### 3. Ms. Carpenter's Assessment

As mentioned previously, M.M.S.'s special education teacher Ms. Carpenter completed a "Teacher Questionnaire" wherein she rated and described M.M.S.'s limitations in each domain. Tr. 162-69. The SSA classifies teachers as "non-medical sources" and has explained that they

"are valuable sources of evidence for assessing impairment severity and functioning." *See* S.S.R. 06-03p, Titles II & XVI: Considering Opinions & Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims, 2006 WL 2329939, at *3 (S.S.A. Aug. 9, 2006). This rationale is "based on their close interaction with students on a regular basis." *Archer*, 910 F. Supp. 2d at 423. The reports of a child claimant's teacher should be "afforded significant weight" when the reporting teacher had an extended opportunity to observe the claimant's functioning. *Titus ex rel. N.M.C. v. Colvin*, No. 3:12-cv-1056 (MAD/VEB), 2014 WL 897038, at *9 (N.D.N.Y. Mar. 6, 2014) (citing *Edmond v. Barnhart*, No. 04-CV-6515, 2006 WL 2769922, at *10 (W.D.N.Y. Aug. 9, 2006) ("The Commissioner encourages the use of non-medical evidence provided by a teacher, who works with a child on a daily basis and observes him in a social setting with peers as well as adults.")). Ms. Carpenter indicated that she had known M.M.S. for five months and that she sees her Monday through Friday from 9:00 a.m. to 3:35 p.m. for reading, math, writing, and special education. Tr. 162.

The ALJ relied on Ms. Carpenter's findings, among other evidence in the record, to determine that M.M.S. had a "marked" limitation in the Attending and Completing Tasks domain. Tr. 17, 19-20 (citing Tr. 164). It is important to note that, because the ALJ found that M.M.S. had a "marked" limitation in this domain, finding a marked limitation in any other functional domain would have led to a favorable disability finding. *Hairston ex rel. S.N. v. Comm'r of Soc. Sec.*, 52 F. Supp. 3d 657, 674 (S.D.N.Y. 2014); *see also* 20 C.F.R. § 416.926a(d).

Although the ALJ relied on Ms. Carpenter's findings in the Attending and Completing Tasks domain,[10] he discounted Ms. Carpenter's assessment in the Acquiring and Using

---

[10] The ALJ also relied on Ms. Carpenter's assessment in the Interacting and Relating with Others, Moving About and Manipulating Objects, and Caring for Yourself domains. Tr. 21-23 (citing Tr. 165-67).

Information domain in part because it "appear[ed] to be based upon [M.M.S.]'s difficulty to attend and persist in tasks rather than on the intellectual ability to acquire and use information."[11] Tr. 17. The ALJ also stated that "in [Ms. Carpenter's] comment in connection with this assessment, she noted [M.M.S.]'s difficulty staying on task and focusing in both large and small groups, and that she was below grade level in both reading and math, but that it was unknown whether this was because of ability to stay on task and process information or her high absenteeism." Tr. 17 (citing Tr. 163).

This is an improper reason to discount Ms. Carpenter's opinion because the SSA recognizes that "any given impairment may have effects in more than one domain," and therefore it promises to "evaluate the limitations from [the claimant's] impairment(s) in any affected domain(s)." 20 C.F.R. § 416.926a(c) (effective June 13, 2011 to June 11, 2015); *see also Encarnacion ex rel. George v. Astrue*, 568 F.3d 72, 73-74 (2d Cir. 2009). Similarly, Social Security Ruling ("S.S.R.") 09-1p explains that the SSA will "always evaluate the 'whole child' when [it] make[s] a finding regarding functional equivalence, unless [it] can make a fully favorable determination or decision without having to do so." S.S.R. 09-1p, Title XVI: Determining Childhood Disability Under the Functional Equivalence Rule—The "Whole Child" Approach, 2009 WL 396031, at *2 (S.S.A. Feb. 17, 2009). This Ruling further explains that

> it is incorrect to assume that the effects of a particular medical impairment must be rated in only one domain or that a combination of impairments must always be rated in several. Rather, [ALJs] must consider the particular effects of a child's impairment(s) on the child's activities in any and all of the domains that the child uses to do those activities, based on the evidence in the case record.

---

[11] The ALJ also discounted Ms. Carpenter's assessment in this domain because he found it inconsistent with M.M.S.'s Woodcock-Johnson scores and the IEP's report that she "appeared to have average cognitive skills." Tr. 17 (citing Tr. 217-18). As discussed previously, the Court finds that these records do not provide substantial evidence for the ALJ's conclusion in the Acquiring and Using Information domain. Therefore, the Court also finds that this evidence does not provide any legitimate reasons for discounting Ms. Carpenter's assessment.

*Id.* at *3.

This Ruling also specifically illustrates how a child with ADHD, like M.M.S., might be impaired in several domains. *Id.* at *4-5. It concludes that "even though attentional difficulties and hyperactivity are hallmarks of AD/HD," the child's activities may demonstrate that this impairment causes limitations that must be rated in the other domains and that "it would be incorrect to assume that th[e] child's AD/HD causes limitations only in the domain of 'Attending and completing tasks.'" *Id.* at *5. Thus, the ALJ should not have interpreted Ms. Carpenter's assessment as indicating limitations in the Attending and Completing Tasks domain only.

Accordingly, for all the reasons stated, the Court finds that the ALJ improperly evaluated Ms. Carpenter's opinion and finds that it was entitled to significant weight. The ALJ credited many of Ms. Carpenter's findings and relied on them in his disability analysis, yet rejected her findings in the Acquiring and Using Information domain without valid reasons. Moreover, Ms. Carpenter had an extended opportunity to observe M.M.S.'s functioning and her assessment is the most comprehensive evaluation of M.M.S.'s functioning in the record.

### 4. Remand for Calculation of Benefits

M.M.S. argues that the Commissioner's decision should be reversed and that this matter should be remanded solely for the calculation of benefits because the evidence establishes that she has "marked" limitations in two domains of functioning—Attending and Completing Tasks and Acquiring and Using Information—and thus is disabled pursuant to the Commissioner's regulations. ECF No. 10-1, at 21. The Court agrees.

District courts are authorized to affirm, reverse, or modify the Commissioner's decision "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand for calculation of benefits is appropriate only in cases where the record "provides persuasive proof

of disability and a remand for further evidentiary proceedings would serve no purpose." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *see also Butts v. Barnhart*, 388 F.3d 377, 385-86 (2d Cir. 2004). Courts are directed to avoid "contribut[ing] any further to the delay of the determination of [a claimant's] application by remanding for further administrative proceedings" when such an instruction would prove unnecessary. *Diaz ex rel. E.G. v. Comm'r of Soc. Sec.*, No. 06-CV-530-JTC, 2008 WL 821978, at *8 (W.D.N.Y. Mar. 26, 2008). Moreover, "[d]elay is harmful for any litigant, but particularly in connection with benefits for children, which are not to replace lost income, but to enable low-income families to afford special education, medical treatment, physical rehabilitation, early intervention services, and personal needs assistance for the child." *Brown ex rel. J.B. v. Colvin*, No. 1:12-CV-1062 MAT, 2015 WL 1647094, at *9 (W.D.N.Y. Apr. 14, 2015) (citation omitted).

Here, the Court concludes that remanding to the Commissioner for further proceedings "would serve no productive purpose, would not produce findings contrary to this Court's conclusions, and would only cause further delay." *Id.* (citation omitted). The ALJ had access to the entire record and his determination that M.M.S. had "less than marked" limitation in the Acquiring and Using Information domain was legally flawed in several ways and is unsupported by substantial evidence.

Based on the extensive evidence outlined above, it would be futile to remand this case for further consideration because the only conclusion that the record supports is that M.M.S. suffers a "marked" limitation in at least two domains and is therefore disabled pursuant to the Commissioner's regulations. 20 C.F.R. § 416.926a(d). Moreover, the Court is mindful that nearly four and a half years have passed since Plaintiff initially applied for SSI benefits on M.M.S.'s behalf. Tr. 137-42; *see, e.g.*, *Myers ex rel. C.N. v. Astrue*, No. 09-CV-1429 (VEB),

14

2012 WL 4107453, at *11 (N.D.N.Y. Sept. 18, 2012) (holding that a two-year delay permitted remand for calculation of benefits and noting that "the purpose of providing SSI benefits to children is to assist them *while they are children*") (alterations and citation omitted) (emphasis added); *Dabul-Montini ex rel. N.D. v. Astrue*, No. 09-CV-966 (TJM/VEB), 2010 WL 3584348, at *11 (N.D.N.Y. July 30, 2010), *report and recommendation adopted*, 2010 WL 3584289 (N.D.N.Y. Sept. 7, 2010) (holding that a near five-year delay warranted remand for calculation of benefits).

## CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 10) is GRANTED and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 11) is DENIED. The Commissioner's decision is REVERSED and this matter is REMANDED to the Commissioner solely for the calculation and payment of benefits. The Clerk of Court is directed to enter judgment and close this case.

IT IS SO ORDERED.

Dated: August 9, 2017
Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court